UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**ATLANTIC NEUROSURGICAL SPECIALISTS P.A.,** *et al.*

    **Plaintiffs,**

    v.

**UNITED HEALTHCARE GROUP INC.,** *et al.*

    **Defendants.**

Civ. No. 20-13834 (KM) (JBC)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Two medical providers, Atlantic Neurosurgical Specialists, P.A. ("Atlantic Neuro") and American Surgical Arts, P.C. ("American Surgical"), along with physicians Ronald P. Benitez, M.D. ("Dr. Benitez"), Yaron A. Moshel, M.D. ("Dr. Moshel"), and Sean Bidic, M.D. ("Dr. Bidic"), bring this action on behalf of patients, F.L., P.T., and J.C. (the "Patients").[1] The Patients were insured by health plans issued by one of the following defendants: UnitedHealth Group Inc.; United Healthcare Services, Inc.; United Healthcare Insurance Company; United HealthCare Services LLC; Oxford Health Plans, LLC; or Oxford Health Insurance, Inc. (collectively, "United").

Before the Court is Plaintiffs' motion for leave to amend the complaint (DE 33),[2] which is accompanied by a proposed second amended complaint ("PSAC"). For the following reasons, the motion to amend is **GRANTED**.

---

[1] Atlantic Neuro and American Surgical bring this action as "authorized representatives" of the Patients, while the physician plaintiffs bring this action on behalf of the Patients as "attorneys-in-fact," pursuant to written powers of attorney. The PSAC asserts claims by Atlantic Neuro and Atlantic Spine "as 'authorized representatives' to preserve the issue on appeal." (DE 33-1 p. 1.)

[2] Citations to the record will be abbreviated as follows:

## I. BACKGROUND

The Court presumes familiarity with the nature and history of this litigation. I focus on the facts most relevant to Plaintiffs' pending motion to amend the complaint.

### A. Allegations of the Original Complaint

Atlantic Neuro brought this action on behalf of itself and patients C.L., F.L., and P.T. (Compl. ¶ 5),[3] who all received emergency treatment from Atlantic Neuro and subsequently received an adverse benefit determination by United related to their treatment. (*Id.* ¶¶ 35, 38, 50, 53, 65, 67.) Similarly, American Surgical brought this action on behalf of itself and J.C., who also received an adverse benefit determination from United following service rendered by American Surgical. (*Id.* ¶¶ 9, 80, 82.)

Both Atlantic Neuro and American Surgical, as purported authorized representatives, sought to pursue first- and second-level administrative appeals contesting the amounts paid by United to the respective patients. (*Id.* ¶¶ 39, 43, 54, 58, 68, 72, 83, 87.) United declined to process those appeals, however, because the purported designation of authorized representative form ("DAR Form") submitted on behalf of each patient lacked the required information. (*Id.* ¶¶ 40, 44, 55, 59, 69, 73, 84, 88.)

The Initial Complaint alleges that "United consistently and systematically refuses to recognize a duly-executed" DAR Form "submitted by its beneficiaries, particularly when those DAR Forms are executed in favor of the beneficiary's health care provider." (*Id.* ¶32.) Accordingly, the Initial Complaint alleges that

---

"DE" = Docket entry number in this case.

"Compl." = Plaintiffs' Initial Complaint (DE 1)

"PSAC" = Plaintiffs' proposed Second Amended Complaint (DE 33-2, Ex. 1)

"Br." (DE 33-1) = Plaintiffs' Brief in Support of Motion to Amend

"Opp." (DE 38) = United's Brief in Opposition to Plaintiffs' Motion to Amend

"Reply" (DE 41) = Plaintiffs' Reply Brief in Support of Motion to Amend

[3] The PSAC removes all allegations pertaining to patient C.L.

United has an unreasonable "DAR Denial Policy"[4] that is in violation of ERISA's "minimum requirements for employee benefit plan claims and appeal procedures"—specifically, 29 C.F.R. § 2560.503-1 (the "Claims Procedure Regulation"). (*Id.* ¶¶ 22, 28.) The Initial Complaint also alleges that, in implementing that Policy, United utilized a template denial letter ("the DAR Denial Template"), which violates the Claims Procedure Regulation for several reasons. The Initial Complaint notes that the DAR Denial Template includes a copy of United's own DAR Form, which contains "an automatic expiration of the authorization contained therein one year from its execution." (*Id.* ¶¶ 42, 57, 71, 86.) The Initial Complaint alleges that the automatic expiration is "the only significant substantive distinction between the United DAR Form and the DAR executed in favor" of Plaintiffs. (*Id.* ¶¶ 42, 57, 71, 86.)

### B. Prior Opinions

I filed a decision dismissing the Initial Complaint because it did not sufficiently establish standing under Article III and ERISA. (DE 21 pp. 9-17.) Following dismissal, Plaintiffs filed a motion for leave to file their proposed first amended complaint ("PFAC"). (DE 23.) I denied Plaintiffs' motion to amend after concluding that Plaintiffs' amendments did not rectify the shortcomings of the Initial Complaint regarding Article III standing. However, I also held that the PFAC adequately pleaded statutory standing for the physicians to assert ERISA claims on behalf of F.L., P.T., and J.C. (DE 31.)

Regarding Article III standing, I noted that the PFAC failed to allege facts sufficient "to establish that [the Patients] were entitled to the benefits *prior* to United's application of its DAR Denial Policy." (*Id.* at 10.) Therefore, Plaintiffs could not establish "(1) that the Patients were entitled to benefits at all; and (2) that 'a victory in this Court—a declaration that United's Uniform DAR

---

[4] As I expressed in my previous opinions, this terminology seems to be Plaintiffs' invention. For purposes of describing Plaintiffs' claims, I adopt their terminology, without implying that such a policy exists.

Denial Policy violates ERISA—would entitle the Patients to a more favorable benefits determination.'" (*Id.*)

Specifically, the PFAC failed to "identify or quote any specific plan provision in support of the assertion that the Patients were improperly denied benefits under their respective plans." (*Id.* at 11.) Additionally, Plaintiffs invoked both federal and state law, but the PFAC failed to identify "the specific statutory provisions that give rise to United's alleged obligations to these patients." (*Id.* at 12.)

I concluded that "injury for Article III purposes is not satisfied by merely alleging that procedures were inadequate or that benefits were not received; the complaint must allege facts sufficient to establish that further review of Plaintiffs' claims *would have resulted* in the payment of additional benefits." (*Id.* at 13.) Essentially, the PFAC failed to show "that the denial of benefits was improper under the plan, and that a proper review process would therefore have resulted in the payment of further benefits." (*Id.* at 13–14.)

Turning to standing under ERISA, I reiterated that Atlantic Neuro and American Surgical could not act as attorneys-in-fact under the New Jersey Revised Durable Power of Attorney Act, N.J. Stat. Ann. § 46:2B-8.1 *et seq.* ("RDPAA") (*Id.* at 15.) However, as to the individual doctors (*i.e.,* Drs. Benitez, Moshel, and Bidic), I concluded that the PFAC properly alleged that they asserted claims as "attorneys-in-fact" on behalf of the patients, pursuant to valid POAs. (*Id.*) The PFAC identified the patients claiming benefits, alleged factually that each POA complied with the RDPAA's procedural requirements, and stated the amount that each patient remained responsible to pay after United's reimbursement. (*Id.*)

### C. New Factual Allegations

Plaintiffs submit that the PSAC now includes the information that I found was required to allege a sufficient injury-in-fact to establish Article III standing—"specific references to the portions of the Patients' plans that entitle

4

the Patients to the benefits they claim they are entitled to." (Br. p. 6; *see also* PSAC ¶¶ 44–57 (F.L.); 71, 76–83 (P.T.); 98, 103–114 (J.C.).

As to F.L., the PSAC alleges that F.L.'s plan covers "Emergency Services" by "Non-Participating Providers." (PSAC ¶¶ 44–46.) Under F.L.'s plan, the "Allowed Amount" to be paid to a "Non-Participating Provider" rendering "Emergency Services," is the greater of

> 1) the amount We have negotiated with Participating Providers for the Emergency Service (and if more than one amount is negotiated, the median of the amounts); 2) 100% of the Allowed Amount for services provided by a Non-Participating Provider (*i.e.*, the amount We would pay in the absence of any Cost-Sharing that would otherwise apply for services of Non[-]Participating Providers); or 3) the amount that would be paid under Medicare. The amounts described above exclude any Copayment or Coinsurance that applies to Emergency Services provided by a Participating Provider.

(*Id.* ¶ 48.) The plan further states that, for those same services, F.L. will be "held harmless for any Non-Participating Provider charges that exceed Your Copayment, Deductible or Coinsurance." (*Id.* ¶ 49.)

The PSAC also alleges that Atlantic Neuro, Dr. Benitez, and F.L.'s plan participate in a "Complementary Provider Network" offered by MultiPlan. (*Id.* ¶ 54.) By joining that network, providers are reimbursed a defined "Contract Rate" for the services they provide to patients with health benefit plans that participate in the network. (*Id.* ¶ 52.) Therefore, according to Plaintiffs, the "Allowed Amount" should have been

> (i) the Contract Rate as defined by Atlantic Neuro's contract with MultiPlan to the extent F.L.'s plan participated in that network . . . ; or (ii) Atlantic Neuro's full-billed charges, less only F.L.'s copayment, deductible, or coinsurance, thereby holding F.L. harmless from all amounts over and above the applicable cost-sharing amounts as specifically provided for under the plan.

(*Id.* ¶ 55.) United did not pay either amount. (*Id.*) Instead, United paid only a portion and left F.L. with the balance. (*Id.* ¶¶ 56–57.)

With regards to P.T., the PSAC alleges that P.T.'s plan permits services by a non-participating provider when such services are approved and coordinated

by United and the services are not available from a "Network" provider. (*Id.* ¶ 77.) Prior to treating P.T., Atlantic Neuro requested and received confirmation that United would "honor P.T.'s in-network benefit levels as defined under P.T.'s plan even though the services were to be provided by a non-network provider," thereby deeming the services "Covered Health Services" under P.T.'s plan. (*Id.* ¶ 78.) Pursuant to P.T.'s plan, those covered services should be paid by United in "an amount negotiated by [United] or an amount permitted by law." (*Id.* ¶ 79.)

As to that "negotiated" rate, P.T.'s plan participates in United's "Shared Savings Program"—"a program in which UnitedHealthcare may obtain a discount to a non-Network provider's billed charges." (*Id.* ¶¶ 80–81.) Plaintiff asserts that MultiPlan's "Complementary Provider Network," described above, is one method for United to access negotiated discounts with non-network providers. (*Id.* ¶ 81.) Atlantic Neuro, Dr. Moshel, and P.T.'s plan participate in that "Complementary Provider Network." (*Id.* ¶ 82.) Therefore, according to Plaintiffs, United should have provided coverage to P.T. in the amount of

> (i) the Contract Rate as defined by Atlantic Neuro's contract with MultiPlan to the extent P.T.'s plan participated in that network . . . ; or (ii) Atlantic Neuro's full-billed charges, less only P.T.'s copayment, deductible, or coinsurance, thereby holding [P.T.] harmless from all amounts over and above the applicable cost-sharing amounts as specifically provided for under the plan.

(*Id.* ¶ 83.) However, United has not made any payment to Atlantic Neuro to cover P.T.'s services. (*Id.*)

As to J.C., the PSAC alleges that J.C.'s plan provides coverage for J.C.'s services, as required under the Women's Health Cancer Rights Act of 1998 ("WHCRA"). (*Id.* ¶ 103.) The PSAC also alleges that J.C.'s plan does not contain a "plan-based exclusion" for "out-of-network" services. (*Id.* ¶ 104.) Additionally, by making partial payment, United found that the services were "Covered Medical Services." (*Id.* ¶ 105.) Under J.C.'s plan, "Covered Medical Services" are calculated based on

6

> (i) "[n]egotiated rates agreed to by the non-Network provider and either [United] or one of the [United's] vendors, affiliates or subcontractors, at [United's] discretion; or (ii) "if rates have not been negotiated, the Claims Administrator shall determine the applicable Eligible Expenses based on such reasonable methods as it determines from time to time. For more information on how Eligible Expenses are calculated, please visit www.myuhc.com."

(*Id.* ¶ 106.) As to the "negotiated" rate, J.C.'s plan participates in United's "Shared Savings Program" and American Surgical, Dr. Bidic, and J.C.'s plan participate in MultiPlan's "Complementary Provider Network," described above. (*Id.* ¶¶ 107–09.)

Additionally, per United's website, J.C.'s "Covered Medical Services" may be paid based on, among other things, "the reasonable and customary amount," or other similar terms. (*Id.* ¶ 111.) When the plan requires payment for "reasonable and customary" amounts, or similar language, then United affiliates "most commonly refer to a schedule of charges created by FAIR Health, Inc. ('FAIR Health') to determine the amount of the payment" and "frequently use the 80th percentile of the FAIR Health Benchmark Databases to calculate how much to pay for out-of-network services of health care professionals." (*Id.* ¶ 112.) The PSAC also alleges that United has admitted that the 80th percentile of the FAIR Health Benchmark Database is its "default" pricing methodology. (*Id.* ¶ 113.) Additionally, the "Explanation of Benefits" issued in response to J.C.'s claim "indicates that reimbursement under the plan is made based on 'competitive fees', which United has defined in written communications to mean the 80th percentile of Fair Health." (*Id.* ¶ 106.)

Therefore, United should have provided coverage to J.C. in the amount of

> (i) the Contract Rate as defined by American Surgical's contract with MultiPlan to the extent J.C.'s plan participated in that network . . . ; or (ii) the 80th percentile of the FAIR Health Benchmark Databases based on J.C.'s plan's invocation of "reasonable and customary charges" as it relates to services covered by WHCRA and/or its invocation of "reasonable" methods for determining Eligible Expenses for all other services rendered to plan members by non-Network providers.

7

(*Id.* ¶ 114.) United failed to pay either of those amounts. (*Id.*)

## II. DISCUSSION

### A. Standard of Review

Generally, motions to amend are governed by Federal Rule of Civil Procedure 15(a), which allows amendments either as a matter of right within a certain time limit or thereafter "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "[L]eave [to amend] shall be freely given when justice so requires." *Id.* Accordingly, courts "have shown a strong liberality . . . in allowing amendments under Rule 15(a)." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous.*, 663 F.2d 419, 425 (3d. Cir. 1981) (quoting 3 J. Moore, Moore's Federal Practice ¶ 15.08(2) (2d ed. 1980)). On a motion to amend, the court will consider the following factors: (1) undue delay on the part of the party seeking to amend; (2) bad faith or dilatory motive behind the amendment; (3) repeated failure to cure deficiencies through multiple prior amendments; (4) undue prejudice on the opposing party; and (5) futility of the amendment. *See Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"Futility" means that the complaint, as amended, "would not withstand a motion to dismiss." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 125 (3d Cir. 1983); *see also Brown v. Philip Morris Inc.*, 250 F.3d 789, 796 (3d Cir. 2001); *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). The standards governing a rule 12(b)(6) motion are well known, have been stated in the Court's prior opinions, and therefore need not be stated in detail here. In brief, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As applicable here, futility has a jurisdictional component, and to that extent is equivalent to a "facial" motion to dismiss under Rule 12(b)(1). *See generally Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015).

### B. Analysis

United does not rely on the Rule 15 factors of delay or prejudice, but argues that the PSAC should be rejected as futile and for failure to cure deficiencies identified by the Court. For present purposes, then, the motion to amend is equivalent to a motion to dismiss.

### 1. Article III Standing

Plaintiffs argue that the PSAC remedies the shortcomings of the PFAC detailed in my prior opinion and therefore alleges a sufficient injury-in-fact, thus establishing Article III standing. In their view, the PSAC now "contains citations to the United plans through which each of the Patients had health benefits at the time the services in issue were provided [and] . . . very plainly substantiate Plaintiffs' entitlement to further benefits." (Br. p. 2.)

In opposition, United asserts that the PSAC still fails to establish Article III standing. (Opp. p. 2.) According to United, the PSAC's new allegations do not support that the DAR Denial Policy "*caused* the denial of benefits," or that it had any effect at all on the Patient's benefits, because the PSAC fails to allege that a different policy would have led to a different benefits determination. (*Id.* at 2–3.) United states that it is still true that "United's claims determination occurred *before* its application of the alleged DAR Policy," and the PSAC does not allege that the DAR Denial Policy played some role in the wrongful denial of benefits. (*Id.* at 3.) In any event, United contends that the PSAC does not plausibly allege that Plaintiffs are entitled to additional benefits under the terms of their respective plans. (*Id.* at 12.)

Article III of the U.S. Constitution gives federal courts the power to hear "cases" and "controversies," U.S. Const. Art. III, § 2, a requirement which implies that a plaintiff must have "standing," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998). To have standing, a plaintiff must have (1) an injury (2) that is traceable to the defendant and (3) redressable by the suit. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Injury in fact, "the first and foremost of

standing's three elements," is a constitutional requirement. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted).

Plaintiffs seek a determination that United's DAR Denial Policy violates ERISA and an order sending their claims "back to United to provide the Patients with the full and fair review they were entitled to under ERISA." (Br. p. 2.) As I previously explained, in order for such a procedural challenge to satisfy an injury for Article III purposes, Plaintiffs must adequately allege that they were entitled to the denied benefits "*prior* to United's application of its DAR Denial Policy," such that a full and fair review "*would have resulted* in the payment of additional benefits." (DE 31 pp. 10, 13); *see also Condry v. UnitedHealth Grp., Inc.*, 2021 WL 4225536, at *3 (9th Cir. Sept. 16, 2021). As described in Section I.C., *supra*, the PSAC now contains specific references to the Patients' plans and allegations explaining their entitlement to additional benefits following a full and fair review. The issue that remains is whether the PSAC sufficiently alleges that the Patients were entitled to the denied benefits under the terms of their respective plans. Taking the allegations as true, as I must, I find that Plaintiffs have satisfied that requirement.

United asserts that the MultiPlan and FAIR Health discount programs mentioned in the PSAC cannot form the basis of Plaintiffs' entitlement to additional benefits because United's use of those programs is "discretionary." (Opp. pp. 12–15.) Whether or not United's position is correct, it ignores other allegations in the PSAC supporting Plaintiffs' claims that the Patients are entitled to additional reimbursement. For example, Plaintiffs include specific allegations supporting that (i) F.L. was wrongfully denied protection from "balance-billing" (PSAC ¶¶ 49, 55–57); (ii) P.T. was entitled to, but did not receive, some amount of coverage, either at a "negotiated" rate or an amount permitted by law (*Id.* ¶¶ 78–79, 83); and (iii) J.C.'s claims should have been, but were not, covered pursuant to a "negotiated" rate or a "reasonable method," and in a manner determined by the member and physician, consistent with the WHCRA. (*Id.* ¶¶ 97, 106, 111.)

Accordingly, Plaintiffs have adequately amended the complaint to clarify the omissions and ambiguities identified in my prior opinions with regards to an entitlement to additional benefits. To be clear, I do not suggest that their claims for benefits have been established, but only that these are claims that these plaintiffs are entitled to make. Therefore, I find that they have surmounted the low threshold of Article III standing.

### 2. The DAR Denial Policy Under ERISA

ERISA grants the Department of Labor ("DOL") the power to promulgate regulations governing the claims-procedure process. *See* 29 U.S.C. §§ 1133, 1135. Pursuant to that authority, the DOL promulgated the Claims Procedure Regulation, which "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. § 2560.503-1. The Claims Procedure Regulation requires every employee benefit plan to "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560.503-1(b). At issue in this case is subparagraph (b)(4) of the Claims Procedure Regulation, which states:

> The claims procedures do not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination. Nevertheless, a plan may establish *reasonable* procedures for determining whether an individual has been authorized to act on behalf of a claimant.

29 C.F.R. § 2560.503-1(b)(4) (emphasis added).

I first address United's argument that the Claims Procedure Regulation does not apply because its responses to Plaintiffs' appeals were not "adverse benefits determinations." (Opp. pp. 8–9.) The plain language of the Claims Procedure Regulation states that it applies to the pursuit of an "appeal of an adverse benefit determination." 29 C.F.R. 2560.503-1(b)(4). Plaintiffs allege that the initial denials of benefits, which they sought to appeal, were "adverse benefit determinations," which of course they were. (*See, e.g.*, PSAC ¶¶ 37, 47,

11

91, 105.) Therefore, 29 C.F.R. § 2560.503-1(b)(4) applies to the procedures used by United in response to those appeals.

Next, United asserts that its DAR review policy comports with the Claims Procedure Regulation. According to United, it is "reasonable" to require claimants to use only United's DAR Form. (Opp. pp. 4–6.) For support, United references Question B-1 of the DOL's "Benefit Claims Procedure Regulation FAQs," which asks: "May a plan require that a claimant complete and file a form identifying any person authorized to act on his or her behalf with respect to a claim?"[5] In response, the DOL gives a qualified "yes":

> Yes, with one exception. The regulation provides that a reasonable claims procedure may not preclude an authorized representative of a claimant from acting on behalf of a claimant with respect to a benefit claim or appeal of an adverse benefit determination. The regulation also provides, however, that a plan may establish reasonable procedures for determining whether an individual has been authorized to act on behalf of the claimant. *Completion of a form by the claimant* identifying the authorized representative would be one method for making such a determination.

*Id.* (emphasis added). United claims that "courts have recognized" that the to require "completion of a form by the claimant" (italicized above) in the DOL guidance means to "require claimants to complete a specific form." (Opp. p. 6.) But the portion of the case quoted by United is simply a paraphrase of the DOL's guidance; it is not a holding, or even really a recognition, that it is a "reasonable procedure" to require a claimant to use only a precise, specific DAR form. *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 375 (N.D. Ill. 2012).

Similarly, United asserts that it is a reasonable procedure to require a DAR Form to expire after one year. (Opp. pp. 4–6.) However, the cases on which United relies do not address the reasonableness of that procedure. *See Pa. Chiropractic Ass'n*, 286 F.R.D. 355; *Parkridge Med. Ctr., Inc. v. CPC Logistic, Inc.*

---

[5] *See* https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation (last visited Dec. 9, 2022).

*Grp. Ben. Plan*, 2013 WL 3976621 (E.D. Tenn. Aug. 2, 2013); *Omega Hosp., LLC v. United Healthcare Servs., Inc.*, 345 F. Supp. 3d 712 (M.D. La. 2018). Only *Omega* mentions a one-year term of authorization at all. In *Omega*, United moved to dismiss the claims brought by a healthcare provider on behalf of its patient because the DAR form at issue included a one-year term, which had expired. 345 F. Supp. 3d at 731–32. The *Omega* opinion, however, is bereft of any discussion of whether that one-year term was "reasonable."

In short, the claims as to the reasonableness of these procedures, whatever their merits, are sufficient to survive a motion to dismiss.

United also asserts that Plaintiffs do not adequately allege that United violated 29 C.F.R. §§ 2560.503-1(g) or (j). (Opp. pp. 9–11.) United cites to the following paragraph of the PSAC (alleged identically for each of the Patients), which quotes from, but does not cite to, 29 C.F.R. § 2560.503-1(g):

> United thus denied and/or ignored each of [Atlantic Neuro's/American Surgical's] appeals on behalf of [F.L./P.T./J.C.]. In doing so, United failed to provide [Atlantic Neuro/American Surgical], on behalf of [F.L./P.T./J.C.], a "full and fair review" of its "adverse benefit determinations" under the Claims Procedure Regulations,[6] which include the giving of specific notice and appeal rights, including giving "[t]he specific reason or reasons for the adverse determination," "[r]eference to the specific plan provisions on which the determination is based," a description of additional materials or information necessary to perfect the claim, "[a] description of the plan's review procedures and the time limits applicable to such procedures," including notification that the claimant has a right to bring a civil action under ERISA to challenge the decision, and making available, free of charge, copies of any "internal rule, guideline, protocol, or similar criterion [that] was relied upon in making the adverse determination."

---

[6] For accuracy, I note that the paragraph related to F.L.'s claims includes one phrase that is not present in the paragraphs related to P.T.'s or J.C.'s claims, shown here in italics: "full and fair review" *and to engage in "meaningful dialogue"* of its "adverse benefit determinations" under the Claims Procedure Regulations. (PSAC ¶ 65 (emphasis added).)

13

(PSAC ¶¶ 65, 91, 124.) United interprets that paragraph as an assertion of additional claims for violation of 29 C.F.R. §§ 2560.503-1(g) or (j). United reads that paragraph too broadly. That paragraph of the PSAC states that, because United denied the Patients a "full and fair review" of their "adverse benefits determinations," they did not receive the information that United would have been required to give to them if a "full and fair review" had been conducted. As the next paragraph of the PSAC explains, if Plaintiffs had been given a "full and fair review," they would have had, among other things, the ability to "develop a robust administrative record." (*See* PSAC ¶¶ 67, 92, 125.) In any event, Plaintiffs do not state in the PSAC that they are bringing claims for violation of 29 C.F.R. §§ 2560.503-1(g) or (j), and I will not infer such claims where Plaintiffs themselves do not appear to be pressing them.

United also disagrees with Plaintiffs' "conclusory" assertion that it "treats DAR forms submitted by healthcare providers differently from other DAR forms"—*i.e.*, that United implemented a "Uniform DAR Denial Policy." (Opp. p. 11.) At this stage of the litigation, Plaintiffs have alleged sufficient facts to support their contention. (*See, e.g.*, PSAC ¶¶ 137–38 ("[T]he Uniform DAR Policy effectively mandates the use of the United DAR Form for health care providers, and especially ONET health care providers. . . . In adopting and implementing the Uniform DAR Denial policy, and specifically the *de facto* requirement that ONET providers utilize the United DAR Form, United seeks to minimize the ability of ONET providers to assist their patients appeal improper benefit denials.").

### 3. Failure to Exhaust

United asserts that the PSAC must be dismissed because Plaintiffs failed to exhaust their administrative remedies. According to United, because its DAR requirements were "entirely reasonable under ERISA and DOL regulations," the Patients were "required to comply with those requirements to effectuate an appeal." (Opp. p. 16.) Plaintiffs respond that they should be deemed to have exhausted their remedies because United did not follow ERISA-compliant

claims procedures. (Reply pp. 10–11.) Alternatively, Plaintiffs assert that they should be excused from exhausting their administrative remedies because it would be futile to do so. (*Id.* at 11.); (*see also* PSAC ¶¶ 68, 94, 127.)

A court "may not entertain an ERISA section 1132(a)(1)(B) claim for benefits unless the plaintiff has complied with and exhausted all administrative prerequisites required by the plan itself." *Metz v. United Counties Bancorp.*, 61 F. Supp. 2d 364, 382–3 (D.N.J. 1999). However, whether a plaintiff has exhausted its administrative remedies is "ordinarily addressed with the aid of evidence adduced in discovery, typically on a motion for summary judgment." *NJSR Surgical Ctr., L.L.C. v. Horizon Blue Cross Blue Shield N.J., Inc.*, 979 F. Supp. 2d 513, 524 (D.N.J. 2013). Therefore, I will not dismiss the PSAC based on a failure to exhaust. That issue can be raised again at summary judgment.

### 4. Claims Under ERISA § 502(a)(1) and § 502(a)(3)

Plaintiffs bring their claims pursuant to 29 U.S.C. § 1132 (also referred to herein as "ERISA § 502"), which provides for civil enforcement of ERISA's provisions. First, Plaintiffs seek to recover under subsection (a)(1)(B), which entitles a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Alternatively, Plaintiffs bring their claims pursuant to subsection (a)(3)(A), which permits a participant, beneficiary, or fiduciary "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(A). If those claims fail, Plaintiffs alternatively assert a cause of action under subsection (a)(3)(B), which allows a participant, beneficiary, or fiduciary "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(B).

United asserts that Plaintiffs' claims for breach of fiduciary duty under § 502 should be dismissed because United processed the Patient's claims in accordance with ERISA, the Claims Procedure Regulation, and the terms of the

Patients' plans. (Opp. pp. 16–17.) However, United's position depends on a determination that has not been reached—that United properly processed the Patients' claims. *See* Section II.B.2., *supra*, (declining to find that United implemented reasonable claims procedures). Therefore, I will not dismiss Plaintiffs' claims for breach of fiduciary duty on that basis.

United also argues that Plaintiffs "may not pursue claims for fiduciary breach under either § 502(a)(1)(B) or § 502(a)(3)" because "a medical provider may only bring a claim if it receives an assignment from its patients; and only a *claim for benefits* may be assigned—not a claim for breach of fiduciary duty or for any form of equitable or prospective relief." (Opp. p. 17.) The cases on which United relies do not support its position. Two held that the medical provider could not bring claims of fiduciary breach under ERISA because the language of the assignments at issue did not encompass such claims. *See Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 258 (2d Cir. 2015) ("By expressly assigning only their right to payment, Rojas's patients did not also assign any other claims they may have under ERISA."); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1292 (9th Cir. 2014) ("Because Spinedex was assigned only the right to bring claims for payment of benefits, Spinedex has no right to bring claims for breach of fiduciary duty."). In the third case, the court questioned "whether patients can even assign claims for breach of fiduciary duty under ERISA § 502(a)(3)." *Am. Psychiatric Assoc. v. Anthem Health Plans*, 50 F. Supp. 3d 157, 163 (D. Conn. 2014), *aff'd*, 821 F.3d 352 (2d Cir. 2016). However, the court did not answer that question, simply assuming for purposes of the motion that the plaintiffs could assign their claims for breach of fiduciary duty. *Id.* The court then addressed the medical providers' standing under ERISA, *id.* at 164, an issue which this court has already decided. As I previously held, Drs. Benitez, Moshel, and Bidic may assert ERISA claims as "attorneys-in-fact" on behalf of the Patients. (DE 31 pp. 15, 17.) However, I also held that Atlantic Neuro and American Surgical, as medical practices, cannot assert ERISA claims as "attorneys-in-fact" on behalf

16

of the Patients. (*Id.* p. 15.) Therefore, the claims brought by Atlantic Neuro and American Surgical are dismissed.

Finally, United asserts that Plaintiffs cannot maintain a claim for violation of § 502(a)(3) because they can obtain complete relief under § 502(a)(1)(B) and Plaintiffs do not identify "any basis for relief under § 502(a)(3) that is distinct from their claim under § 502(a)(1)(B)." (Opp. p. 17.) Plaintiffs respond that it is premature to dismiss their § 502(a)(3) claims as duplicative of their § 502(a)(1)(B) at the pleading stage. (Reply p. 14.) Plaintiffs also assert that they do not seek precisely the same relief under the two claims and are permitted at this stage to plead claims in the alternative. (*Id.* p. 15.)

In *Shah v. Aetna*, the plaintiff similarly alleged a violation of both § 502(a)(1)(B) and § 502(a)(3) and the defendant moved to dismiss the § 502(a)(3) claim as duplicative. No. 17-cv-195, 2017 WL 2918943, at *2 (D.N.J. July 6, 2017). The plaintiff responded that the claims were not duplicative because it sought "such other and further relief as the Court may deem just and equitable" under the § 502(a)(3) claim, and argued that to dismiss its claim at the motion to dismiss stage would be premature. *Id.* Chief Judge Simandle held that "dismissal of an ERISA breach of fiduciary duty claim on this basis is not appropriate at this early procedural stage," and denied the motion to dismiss. *Id.* (collecting cases holding the same).

I agree with Chief Judge Simandle's reasoning and find that, at the pleading stage, it is premature to dismiss claims brought under § 502(a)(3) as "duplicative" of claims brought under § 502 (a)(1)(B) when the plaintiff seeks other appropriate equitable relief under § 502(a)(3). Here, Plaintiffs expressly plead in the alternative, as they are entitled to do. They seek relief under § 502(a)(3)(A) "only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B)" and under § 502(a)(3)(B) "only to the extent that the Court finds that the equitable relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3)(A)." (PSAC ¶¶ 156, 159.) That language is similar to the language

17

in *Shah*. Therefore, I will not dismiss Plaintiffs' § 502(a)(3) claims at this juncture. United may raise this argument again at summary judgment.

### III.  CONCLUSION

Plaintiffs' motion to amend is **GRANTED**. A separate order will issue.

Dated: December 12, 2022

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

18